## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LAZARO VITON RODRIGUEZ et al.,<br><br>*Defendants*. | Criminal Action No. 19-224 (TJK) |

## <u>MEMORANDUM ORDER</u>

A grand jury indicted Defendants in June 2019 for participating in an international drug-importation conspiracy.  But Defendant Cesar Gomez Almonte was not arrested until December 2020, and Defendant Lazaro Viton Rodriguez not until January 2022.  Although they rely on different legal theories, they each now move to dismiss the indictment based on prearrest delay.  The Court has reviewed written and live testimony explaining those delays.  Because the delays were justified by legitimate law-enforcement objectives and constraints—and not caused by the government's negligence or bad faith—the Court will deny their motions.

## I.    Background

### A.    Procedural History

This is not Almonte's first motion on the subject.  About a year after his arrest, he moved to dismiss the indictment, claiming that the 18-month prearrest delay violated his Sixth Amendment right to a speedy trial.  ECF No. 60.  The Court denied that motion.  It reasoned that, although a delay of more than a year is presumptively prejudicial, the government had proffered a valid basis for the delay and that Almonte had neither asserted his speedy-trial rights since his arrest nor articulated specific prejudice.

After Rodriguez was arrested, he discussed the possibility of resolving the case by guilty plea with the government for about eleven months.  *See* ECF No. 113 at 2; ECF No. 117 at 3.

Ultimately, he decided to proceed to trial. ECF No. 117 at 3. In December 2022, he notified the Court that he would move to dismiss the indictment because of the prearrest delay, and the Court set a briefing schedule. *See* Min. Entry of Dec. 23, 2022. He now argues that the roughly 30-month gap between the indictment and his arrest violated his Sixth Amendment right to a speedy trial. ECF No. 121.

Around the same time, Almonte again moved to dismiss the indictment. He claims that the government's proffered explanation in response to his first such motion was knowingly false. ECF No. 135 at 5. Thus, he asks the Court to dismiss the indictment under its supervisory authority to sanction prosecutorial misconduct. *See id.* at 5–6.

Defendants requested an evidentiary hearing. ECF Nos. 133, 144. The Court granted that request because "motions to dismiss on speedy-trial grounds are typically resolved after an evidentiary hearing" and Defendants' motions "arise from overlapping facts." Min. Entry of Apr. 26, 2023 (quotation omitted). It directed the government to explain the prearrest delays with evidence, either written or live. *Id.* In response, the government submitted declarations by David Warner, an Associate Director at the Office of International Affairs, ECF No. 148-3, and Miguel Herrera, Jr., a Special Agent with Homeland Security Investigations ("HSI")—the lead case agent, ECF No. 148-4. It also submitted emails contemporaneously sent to and by Special Agent Herrera and other HSI agents, plus other various documents. *See* ECF No. 148-5–148-17.

The parties addressed those submissions at the evidentiary hearing. Defendants also called Special Agent Herrera to testify. After the hearing, the parties submitted further briefing on the evidence developed in the record. *See* ECF Nos. 152, 153, 158, 159, 164.

### B.     Findings of Fact

After considering all the evidence, including the content of Special Agent Herrera's live testimony and his demeanor while testifying, the Court finds these facts:

Rodriguez is a citizen of Cuba.  Almonte is a citizen of the Dominican Republic.  In June 2019, both men lived in the Dominican Republic.

Special Agent Herrera has worked for HSI since 1998 investigating offenses including narcotics smuggling and money laundering.  In June 2019, he was investigating a drug-trafficking organization allegedly operating out of the Dominican Republic.  He had developed evidence that Rodriguez and Almonte were members of that drug-trafficking organization.  He also had evidence that Luca Finocchiarrio, a citizen of Italy then residing in the Dominican Republic, was a member of the same drug-trafficking organization.  Finocchiarrio was the investigation's main target.  Special Agent Herrera originally intended to seek the simultaneous arrests of Rodriguez, Almonte, and Finocchiarrio.  He preferred to do that because he believed, based on his investigation, that they were co-conspirators, and, in his experience, when one co-conspirator is arrested, others are likely to flee or attempt to destroy evidence.

A grand jury indicted Rodriguez and Almonte on June 28, 2019.  But as for Finocchiarrio, Special Agent Herrera decided to wait to seek an indictment until he had compiled more evidence against him.  At that time, Special Agent Herrera did not yet attempt to have Rodriguez or Almonte arrested, extradited, or removed from the Dominican Republic.  Besides the more generalized reasons to think Finocchiarrio might flee if one of his associates was arrested, Special Agent Herrera thought Finocchiarrio had strong ties to Italy (and other countries) and so he believed Finocchiarrio could easily slip out of the Dominican Republic.

By March 2020, Special Agent Herrera was still working toward an indictment of Finocchiarrio, but his investigation was impeded by the COVID-19 pandemic.  In May 2020, he learned for the first time that the Italian government was investigating Finocchiarrio and that Italian law-enforcement agents intended to arrest him.  That same month, Special Agent Herrera came to

understand that Italian law-enforcement agents intended to issue, at some point in the future, an Interpol Red Notice for Finocchiarrio.[1]  As it turned out, Italian law-enforcement agents had already issued an active Red Notice for Finocchiarrio at least as early as June 2019.

On June 3, 2020, Finocchiarrio was removed from the Dominican Republic to Italy and arrested.  The same day, Special Agent Herrera learned for the first time that Italian law-enforcement agents had already issued an active Red Notice for Finocchiarrio and that he had been removed to Italy.  On June 5, 2020, another HSI agent confirmed for Special Agent Herrera that Italian law-enforcement agents had arrested Finocchiarrio upon his arrival.  The same day, Special Agent Herrera began planning the arrests of Rodriguez and Almonte.

The United States and the Dominican Republic are parties to a bilateral extradition treaty. Under that treaty, the United States must submit extradition requests through formal diplomatic channels.  From initiation to extradition, that process often takes longer than 13 months and can take as long as two years.  An alternative to the extradition process exists for noncitizens of the Dominican Republic:  The Dominican Republic may remove the noncitizen from the country via the United States, which gives U.S. law-enforcement officers an opportunity to arrest the suspect. U.S. law-enforcement officers decided to ask the Dominican Republic to remove Rodriguez from the country via the United States.  That procedure was unavailable for Almonte because he is a citizen of the Dominican Republic.  Because they expected extradition proceedings to take longer than removal proceedings, U.S. law-enforcement officers decided to request Almonte's extradition before requesting Rodriguez's removal.

By September 2020, Special Agent Herrera and others communicated those plans to U.S.

---

[1] An Interpol Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action.

officials working in the Dominican Republic.  U.S. law-enforcement officers finalized an extradition package for Almonte on December 9, 2020.  Before that request was transmitted to the Dominican Republic, Special Agent Herrera learned that Almonte planned to visit the Miami airport on his way to another destination.  Special Agent Herrera arrested Almonte in the Miami airport on December 12, 2020.

Six days later, Special Agent Herrera notified an HSI agent working in the Dominican Republic that he would ask the Dominican Republic to remove Rodriguez via the United States after obtaining internal approval.  Eleven days later, Special Agent Herrera told the same HSI agent that the request had been approved internally.  By January 27, 2021, the same HSI agent had discussed the request with a representative of the U.S. Marshals Service and believed that the request would likely be granted.  Between January 27, 2021, and February 19, 2021, HSI agents, including Special Agent Herrera, conferred internally and with the U.S. Marshals Service and Dominican Republic immigration officials to determine what information was needed to support Rodriguez's removal.

By February 19, 2021, Dominican Republic immigration officials had agreed in principle to remove Rodriguez from the Dominican Republic to Cuba via the United States.  That approval depended on HSI's paying for the cost of transporting Rodriguez.

Between February 19, 2021, and mid-May 2021, U.S. law-enforcement officers located a document establishing Rodriguez's Cuban citizenship and formally requested a removal order.  On July 30, 2021, Dominican Republic immigration officers ordered Rodriguez removed.  By August 26, 2021, Dominican Republic law-enforcement officers had located Rodriguez.  On November 8, 2021, HSI requested funding for the cost of arresting Rodriguez and transporting him to Cuba via the United States.  That request included a plan to perform the operation between December 13–18,

2021.  HSI approved that request on November 9, 2021.  But Special Agent Herrera could not find suitable flights between December 13–18, 2021.

By December 7, 2021, Special Agent Herrera had finalized travel plans to perform the removal operation between January 10–15, 2022.  Dominican Republic immigration officials removed Rodriguez from that country on January 12, 2022.  Special Agent Herrera and another HSI agent traveled with Rodriguez on a plane from the Dominican Republic to Miami.  Special Agent Herrera arrested Rodriguez on January 12, 2022, in the Miami airport.

## II.    Legal Standard

The Sixth Amendment guarantees criminal defendants "a speedy and public trial."  U.S. Const. amend. VI.  Four factors are relevant to deciding whether a defendant has been denied a speedy trial: (1) the length of the delay; (2) its explanation; (3) whether the defendant has asserted his speedy-trial right; and (4) whether he has suffered prejudice.  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  The first factor is both a threshold requirement and—if that requirement is satisfied— a factor to be weighed in the overall analysis.  *United States v. Tchibassa*, 452 F.3d 918, 922–23 (D.C. Cir. 2006).  A delay of more than a year satisfies the threshold requirement.  *United States v. Fernandes*, 618 F. Supp. 2d 62, 68 (D.D.C. 2009).  And the overall analysis requires a holistic inquiry that considers the four factors alongside "such other circumstances as may be relevant," including the nature of the crime charged.  *See United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 203 (D.C. Cir. 2013) (quotation omitted).  The most important factor, however, is "the second factor, the reason for delay."  *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986).

## III.    Analysis

As the Court's factual findings make clear, the government acted rationally and pursued Defendants' arrests with reasonable diligence.  Thus, the "all-important second factor," *Fernandes*, 618 F. Supp. 2d at 75, favors the government.  The third and fourth factors tilt the same way.  Only

the length of the delay conceivably justifies Rodriguez's motion, and even that factor does not help

him much because some delay is understandable in a cross-border conspiracy case.  Moreover,

Almonte's claim that the government's explanation is false (knowingly or otherwise) lacks any

support in the record.  Thus, the Court will deny both motions.

A.      **The Court Will Deny Without Prejudice the Government's Motion to File un-
der Seal Two Declarations**

Before turning to the merits, the Court will address the government's pending motion to

file under seal two of the exhibits it submitted in opposing these motions.  ECF No. 148.  Those

exhibits are the declarations of David Warner, ECF No. 148-3, and Special Agent Herrera, ECF

No. 148-4.  *Id.* at 1.  It explains that those exhibits "supplement prior sealed filings that include

sensitive information about an unindicted co-conspirator and other law enforcement techniques."

*Id.* at 1.  Those prior sealed filings are ECF Nos. 123 and 143, which reference material in earlier

sealed filings, such as the government's opposition to Almonte's first motion to dismiss, ECF

No. 61-1, and a transcript of the Court's oral ruling denying that motion, ECF No. 67.  For the

following reasons, the Court will deny the motion without prejudice and give the government an

opportunity to reassert the motion in light of later developments.

In deciding whether to require public disclosure of filings, the Court must consider the

factors established by *United States v. Hubbard*, 650 F.2d 293, 317–24 (D.C. Cir. 1980).  Those

factors are

> (1) the need for public access to the documents at issue; (2) the extent of previous
> public access to the documents; (3) the fact that someone has objected to disclosure,
> and the identity of that person; (4) the strength of any property and privacy interests
> asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the
> purposes for which the documents were introduced during the judicial proceedings.

*Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017) (quotation

omitted).  Through those factors, the Court must "weigh[ ] the interests advanced by the parties in

light of the public interest and the duty of the courts," and it can permit filings under seal only if it then "concludes that justice so requires." *Id.* at 665–66 (quotation omitted).

Here, the presumptions embedded in the first and sixth factors favor disclosure. Under the first factor, there is a "general public interest in the openness of governmental processes." *See Wash. Legal Found. v. U.S. Sent'g Comm'n*, 17 F.3d 1446, 1452 (D.C. Cir. 1994). And under the sixth factor, there is also a "strong presumption in favor of public access" because the two declarations are an important part of the basis for this order. *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1410 (D.C. Cir. 1996); *Am. Professional Agency, Inc. v. NASW Assurance Servs., Inc.*, 121 F. Supp. 3d 21, 25–26 (D.D.C. 2013).

On the other hand, the Court acknowledges the privacy interests the government asserts and the possibility that it will face prejudice from disclosure. The declarations explain in detail the process for extraditing a suspect from the Dominican Republic and the considerations the government considers relevant to deciding whether, when, and how to attempt extradition. That information could be sensitive as applied here because Finocchiarrio, one of the alleged co-conspirators, has not yet been indicted by the United States, and the government is still weighing whether it will do so. Rough Hrg. Tr. at 112–13. Public disclosure of the declarations could thus impede an ongoing criminal investigation. So it is at least possible that the "interrelated" "third, fourth, and fifth *Hubbard* factors" weigh against disclosure. *See Am. Professional Agency*, 121 F. Supp. 3d at 25 (quotation omitted).

That leaves the second *Hubbard* factor, which ultimately persuades the Court to deny the government's motion without prejudice. When the government filed its motion, there was no reason to think the public had prior access to the declarations' contents, making the second factor neutral. *Am. Professional Agency*, 121 F. Supp. 3d at 24. Now, however, Special Agent Herrera

has testified about the same subject matter and the parties have argued these motions in part based on his testimony—both in open court. That subsequent public disclosure is material to the Court's decision whether to require disclosure. *See In re L.A. Times Commc'ns LLC*, 28 F.4th 292, 298 (D.C. Cir. 2022) (vacating and remanding a district court's sealing decision "in light of . . . public disclosures"). Thus, if the government wishes to reassert its motion for leave to file under seal, it should explain why justice requires the declarations to remain sealed despite public access to some of the information in the declarations.

In addition, because it contains information from those declarations, the Court will file this order provisionally under seal. The Court will order the parties to file specific redactions to this order that eliminate references to any material they wish to remain under seal, and the Court will consider those requests for redaction when it prepares a version of this order for the public docket. *E.g. In re McCormick & Co., Inc.*, No. 15-MC-1825 (ESH), 2017 WL 2560911, at *1 (D.D.C. June 13, 2017).

## B.    The *Barker* Factors Do Not Support Dismissal of the Indictment Against Rodriguez

Now for the merits. More than 30 months passed between Rodriguez's indictment and his arrest. That delay surpassed a year, so the "Court must conduct the *Barker* analysis to determine whether [his] Sixth Amendment rights have been violated." *Fernandes*, 618 F. Supp. 2d at 68.

### 1.    The Length of the Delay

Throughout his briefing, Rodriguez emphasizes the length of the delay. *E.g.*, ECF No. 158 at 1; *id.* at 7 n.4; ECF No. 130 at 2; ECF No. 121 at 2; *id.* at 9. No doubt, a 30-month delay can support dismissal of an indictment. *E.g.*, *Fernandez*, 618 F. Supp. 2d at 68 (dismissing an indictment after a prearrest delay of 23 months). But it is not enough simply to note the passage of time. For one thing, "once the threshold of more than one year is exceeded, the length of the delay does

not strongly sway the ultimate outcome of the speedy trial issue." *Id.* For another, the complexity of the case matters. "[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Lopesierra-Gutierrez*, 708 F.3d at 203 (quoting *Barker*, 407 U.S. at 531).

This case, like *Lopesierra-Gutierrez*, involves allegations of "a complicated and far-reaching conspiracy." 708 F.3d at 203. Still, at least as charged, it is not as complicated or as far-reaching as the conspiracy in that case. The current record specifically identifies only four participants, while the conspiracy in *Lopesierra-Gutierrez* involved fifteen defendants and as many extraditions. *See id.* On the other hand, the delay is shorter too—30 months compared to more than 42 months. *See id.* at 202. And the investigations share obstacles such as the need to extradite defendants, "collect and decipher foreign evidence, and coordinate with foreign witnesses." *Id.* at 203. Under those circumstances, some delay is reasonable and expected.

Among other cases in which prearrest delay has been litigated, the delay here hardly stands out. Besides *Lopesierra-Gutierrez*, the D.C. Circuit has permitted a far longer delay in *Tchibassa*, 452 F.3d at 924–27 (nearly 11 years). Other district courts have also rejected challenges based on similar or longer delays. *E.g.*, *United States v. Taylor*, No. 18-CR-198 (JEB), 2020 WL 7264070, at *8 (D.D.C. Dec. 10, 2020) (delay of "over two-and-a-half years"); *United States v. Homaune*, 898 F. Supp. 2d 153, 169 (D.D.C. 2012) (delay of "almost two years"); *United States v. Goss*, 646 F. Supp. 2d 137, 141 (D.D.C. 2009) (delay of "four and a half years"); *United States v. Brodie*, 326 F. Supp. 2d 83, 88–89 (D.D.C. 2004) (delay of at least seven years).

In context, then, it is hard to find the delay here "uncommonly long." *Doggett v. United States*, 505 U.S. 647, 651 (1992). Even so, the first factor no doubt favors Rodriguez; it simply

carries limited weight.  Thus, the Court "proceeds with skepticism to the remaining *Barker* factors."  *United States v. Ford*, 155 F. Supp. 3d 60, 69 (D.D.C. 2016).

### 2.    The Reason for the Delay

The Court must evaluate the second and most-important factor, the reason for the delay, "along a continuum."  *United States v. Demirtas*, 204 F. Supp. 3d 158, 172 (D.D.C. 2016).  The factor weighs heavily against the government if it deliberately delayed to "gain some tactical advantage."  *Id.* (quoting *Barker*, 407 U.S. at 531).  Less culpable explanations "such as negligence . . . weigh less heavily" against the government but still favor dismissal of the indictment.  *See Vermont v. Brillon*, 556 U.S. 81, 90 (2009) (quotation omitted).  On the other hand, "delay caused by the defense weighs against the defendant."  *Id.*

In the context of a prearrest delay, the Court must also assess whether the government "pursued [Defendant] with reasonable diligence from his indictment to his arrest."  *Doggett*, 505 U.S. at 656.  Normally, when a defendant lives outside the United States, "the hallmark of government diligence is extradition."  *Fernandes*, 618 F. Supp. 2d at 69.  That is, the government fulfills its obligation by formally seeking extradition.  *Id.*  But it may alternatively "present[ ] substantial evidence that extradition would be futile."  *Id.*  Or it can "show[ ] that it attempted extradition informally."  *Id.*  Ultimately, there is no single formula for reasonable diligence—the Court should consider all the facts and circumstances and decide whether the government "put forth 'serious effort' to find and arrest [Defendant]."  *See, e.g.*, *United States v. Boone*, 706 F. Supp. 2d 71, 76 (D.D.C. 2010) (quoting *Barker*, 407 U.S. at 531).

Rodriguez attributes the delay to the government's "negligence."  *See* ECF No. 158 at 4.  That characterization has two facets.  Between the indictment and Finocchiarrio's arrest in Italy, Rodriguez says the government's explanation is facially unreasonable and "not supported by any

specific evidence." *Id.* at 3.  After Finocchiarrio's arrest, Rodriguez says the government's expla-
nation is "nonsensical" and that the evidence shows "a total of 4 short, maybe 5 minute or less,
exchanges by email," which he considers inadequate effort. *See id.* at 4–5.

Much of that argument is answered by the Court's factfindings.  The Court has concluded
that the first part of the prearrest delay was motivated by a fear of alerting Finocchiarrio to the
investigation and prompting him to flee.  Contrary to Rodriguez's argument, that finding is "sup-
ported by . . . facts in evidence." ECF No. 158 at 3.  For one thing, Special Agent Herrera's sworn
testimony—both live and written—is evidence, and the Court finds him credible.  But more im-
portantly, Special Agent Herrera supported that testimony with evidence of contemporaneous con-
versations discussing his motivations for not immediately pursuing Rodriguez's arrest.  For exam-
ple, he told a colleague in December 2019 that he would pursue arrests "once the final target is
indicted." ECF No. 148-5 at 3.  And the day he confirmed Finocchiarrio had been arrested, he
announced that he would "start to coordinate" Rodriguez's arrest.  ECF No. 148-17 at 2.  That
evidence, among other similar conversations, buttresses Special Agent Herrera's testimony, which
in turn confirms what the government has always told the Court:  It "prudentially refrained from
initiating extradition proceedings" against Rodriguez and Almonte until the risk that its main in-
vestigatory target would flee had dissipated.  ECF No. 66 at 10.[2]

---

[2] Special Agent Herrera also testified that at some point, he believed he had enough evi-
dence to seek Finocchiarrio's indictment, but that he held off to develop more evidence.  Defend-
ants do not argue that he *should* have pursued an indictment and that impermissible delay resulted
from any such failure.  To the contrary, they argue that "there was never sufficient evidence con-
necting [Finocchiarrio] to [a] drug conspiracy [with Rodriguez and Almonte]." *See* ECF No. 153
at 3 (Almonte's argument); ECF No. 164 at 1 (Rodriguez's motion to join that argument).  As the
Court explains further below, that argument lacks merit.  But in any event, there are many legiti-
mate reasons for the government to wait to indict a suspect until it has gathered evidence that it
believes is sufficient to convict, even if it has enough evidence to obtain an indictment.  And the
government still has not indicted Finocchiarrio, so there is no basis to conclude that it delayed
pursuing an indictment against him for strategic reasons.

The explanation is also reasonable, as the Court already held in rejecting Almonte's similar motion. The desire to protect the integrity of its investigation—into the investigation's main target, no less—is a "valid reason" for some delay, *Barker*, 407 U.S. at 531, because it furthers the legitimate law-enforcement objective of bringing more offenders to justice. As the Second Circuit once put it, "the need to capture [co-conspirators] is as justifiable a basis for delay as the need to capture [the defendant] himself." *United States v. Muse*, 633 F.2d 1041, 1044 (2d Cir. 1980).

Moreover, to rely on this explanation, the government need not, as Almonte has demanded, "prove that had [the other defendants] been arrested prior to June 2020, Mr. Finocchiarrio would have destroyed evidence and fled." ECF No. 135 at 4. Because the inquiry is ultimately about the government's diligence, not the accuracy of its predictive judgment, it is enough to "present[ ] substantial evidence" that supports the reasonableness of the government's fears. *Cf. Fernandes*, 618 F. Supp. 2d at 69 (requiring only substantial evidence to explain why the government did not pursue extradition) (quotation omitted). Besides the inherent, common-sense reasonableness of fearing that a suspected criminal facing substantial prison time might flee rather than face prosecution, Special Agent Herrera testified credibly that Finocchiarrio had ties to other countries, including Italy, and could leave the Dominican Republic at will.[3] *See* Rough Hrg. Tr. at 123. The government has also proffered (and supported that proffer with evidence in sealed, *ex parte* filings) that cooperating witnesses have identified Rodriguez and Almonte "as associates and members of

---

[3] *Cf. United States v. Nguyen*, 313 F. Supp. 2d 579, 590 (E.D. Va. 2004) ("[I]t is reasonable for the government to conclude that arraigning [a co-conspirator] prior to the arrest of the indicted co-conspirators would create a risk that others would flee."); *United States v. Timoteo*, 353 F. App'x 968, 972 (5th Cir. 2009) ("It was reasonable for the agents to believe that this man, alarmed when [a co-conspirator] did not return, would . . . attempt to destroy evidence[ ] or attempt to flee the scene."); *United States v. Rico*, No. 18-CR-661 (PGG), 2019 WL 4014826, at *19 n.17 (S.D.N.Y. Aug. 26, 2019) ("[I]t would have been reasonable to infer that [a suspect] might . . . attempt to destroy the evidence, flee, or alert co-conspirators . . . to the presence of law enforcement.").

the drug trafficking organization led by . . . Finocchiarrio." ECF No. 154 at 2.

All that is substantial evidence that the government's fears were reasonable. As a result, the time between Rodriguez's indictment and Finocchiarrio's arrest is not attributable to the government's bad faith or negligence.

As for the remaining 18 months of delay, Rodriguez mischaracterizes the evidence of the government's efforts to pursue him and his codefendant. The government did far more than send "4 short . . . exchanges by email." ECF No. 158 at 5. Most saliently, between June and September 2020, the government prepared a request to extradite Almonte. *See* ECF No. 148-6 at 3. During that period, it also notified officials at the U.S. Embassy in the Dominican Republic that it would ask the Dominican Republic to expel Rodriguez under its immigration law. *Id.* Then, within a few weeks of Almonte's unexpected arrest, it got preliminary approval of Rodriguez's removal from the Dominican Republic. *See* ECF No. 148-6 at 3; ECF No. 148-8 at 3–8. Less than three months later, it had tracked down the necessary documents and formally requested removal. ECF No. 148-9 at 2–3. The next two months of delay were caused by the Dominican Republic's processing of that request. *See* ECF No. 148-13 at 6. Another month of delay arose from the need to locate Rodriguez and confirm his identity. *See* ECF No. 148-14 at 2–3. After that, the government arranged the removal operation internally and with a foreign government and carried it out within about 18 weeks. *See* ECF No. 148-15 at 3–5; ECF No. 148-16 at 2; ECF No. 148-4 ¶ 29.

The Court has little difficulty characterizing that sequence of events as reasonable diligence. That is not to say it was perfect. For instance, Special Agent Herrera might have learned much earlier that the Italian government was investigating Finocchiarrio by checking for an active Red Notice. And the government has not explained why it waited nearly six weeks after learning that the Dominican Republic had located Rodriguez to request funding for the removal operation.

*See* ECF No. 148-14 at 2–3; ECF No. 148-15 at 3–5.  Those hiccups, however, do not rise to the level of negligence.  The Red Notice could have told Special Agent Herrera only that the Italian government wished to arrest Finocchiarrio, not that his deportation was imminent, so that information was not indispensable.  And a six-week lull in otherwise essentially continuous efforts to arrest Almonte and Rodriguez does not even approach the circumstances other courts have found negligent—such as a "fifteen-month gap during which the government took no steps whatever." *Fernandes*, 618 F. Supp. 2d at 70.

*Fernandes* provides a useful contrast on this point.  There, the government did not seek extradition and had only one internal conversation about the possibility of extraditing the defendant. *Fernandes* 618 F. Supp. 2d at 69.  As the court there put it, the government took only "two affirmative steps" over 23 months to apprehend the defendant—entering the defendant's name into a database and attempting to lure the defendant via an e-mail ploy. *Id.* at 70.  Here, after Finocchiarrio's arrest, the government sought extradition of Almonte and, after that request became unnecessary, promptly shifted its attention to having Rodriguez removed from the country, persistently pursued that objective—and succeeded.  That last point especially distinguishes this case from *Fernandes*, where the defendant "ultimately returned of his own volition." *Id.* at 71.

Nor is it significant that the government pursued extradition of Almonte before removal of Rodriguez.  Rodriguez contends that, if the government were truly concerned about reducing the risk that a target would flee or destroy evidence, it would "coordinat[e] the arrests of both Almonte and Rodriguez to occur at or around the same time."  ECF No. 158 at 4.  Indeed, that appears to be exactly what the government originally intended.  It does not follow, though, that "the best way to accomplish this is to get the extradition packages moving through the system simultaneously." *Id.*  Because extradition often takes substantially longer than removal and requires a laborious

bureaucratic process, *see generally* ECF No. 148-3 ¶¶ 7–14, requesting Rodriguez's extradition would have risked even further delay. The government, after all, need not formally request extradition to be diligent. It can also "present[ ] substantial evidence that extradition would be futile" or "attempt[ ] extradition informally." *See Fernandes*, 618 F. Supp. 2d at 69. Here, it presented substantial evidence that extradition was an inferior option and that it attempted a superior alternative—and, it bears repeating, succeeded.

Thus, the roughly 30-month delay resulted from a combination of a legitimate prosecutorial decision, supported by "a good-faith belief" and "substantial evidence," and the inherent difficulties of navigating a "complex mix of international and foreign legal rules." *See Demirtas*, 204 F. Supp. 3d at 191. And the delay was not attributable to the government's negligence or its desire for a tactical advantage. So the second factor favors the government. *See Barker*, 407 U.S. at 531.

### 3.   Assertion of the Right

The third factor is the extent to which Rodriguez asserted his speedy-trial right. *See Barker*, 407 U.S. at 531. "[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* But of course, a defendant cannot be faulted for failing to demand a speedy trial before he knew about the charge against him. *Doggett*, 505 U.S. at 653–54. Still, even in prearrest-delay cases, what a defendant does after arrest is relevant to this factor. *See Tchibassa*, 452 F.3d at 926 (noting that the defendant did not move to dismiss until "nine months after his arrest"). That is so because a defendant's behavior reflects both "the reason for the delay" and how much prejudice he suffers from it. *See Barker*, 407 U.S. at 531–32.

Rodriguez rightly points out that he did not waive his speedy-trial right before his arrest. *See* ECF No. 121 at 11. His indictment was sealed until well after his arrest, and no record evidence suggests he knew about the charges. *See* ECF No. 11; Min. Order of Dec. 19, 2022. He also asserts—and the government does not dispute—that he was living "openly and in his own

name" in the Dominican Republic.  ECF No. 121 at 11.

But Rodriguez ignores his post-arrest conduct.  In his first appearance before this Court, he requested a continuance of between 60 and 75 days to review discovery.  He requested another 60 days at his next appearance.  The next five months proceeded similarly, although one week of delay was attributable to the Court's calendar.  *See* Min. Order of Aug. 30, 2022; Min. Entry of Sep. 8, 2022.  In November 2022, Rodriguez joined a motion to continue the case another 60 days, citing the parties' then-ongoing plea negotiations.  ECF No. 113 at 1–2.  It was not until December 21, 2022—more than 11 months after his arrest—that Rodriguez first hinted at his desire for a speedy trial.  *See* ECF No. 116 at 1 ("[I]t appears this matter is in a trial posture . . . .").  Two days later, Rodriguez announced he would move to dismiss on that basis, and the Court set a briefing schedule.  *See* Min. Entry of Dec. 23, 2022; Min. Order of Dec. 27, 2023.

That belated assertion of his right to a speedy trial weighs against dismissing the indict-ment.  The D.C. Circuit has concluded that this factor "cut[ ] decidedly against" a defendant who "did not raise any [statutory speedy-trial] challenge until nearly a year after his arraignment, and . . . never alleged a Sixth Amendment violation."  *United States v. Rice*, 746 F.3d 1074, 1082 (D.C. Cir. 2014).  And in a case much like *Rice*, it noted that the defendant had "joined in or requested many of the continuances, and he waited fourteen months after his arraignment before filing a motion to dismiss" on statutory grounds.  *See United States v. Taplet*, 776 F.3d 875, 881 (D.C. Cir. 2015).  The Circuit applied the same reasoning in a recent constitutional speedy-trial case, *United States v. Bikundi*, noting that the defendant there had failed to "assert her speedy trial rights early or often."  926 F.3d 761, 780 (D.C. Cir. 2019).

Rodriguez's assertion was not so feeble as in those cases, however.  Unlike the defendants in *Rice* and *Taplet*, he did ultimately move for dismissal on constitutional grounds before this

17

Court, and so he has not forfeited his claim as those defendants did. And his assertion came materially faster than the defendant's in *Bikundi*. Even so, taking all that into account, the third factor weighs slightly in the government's favor.

### 4.    Prejudice

The final factor is "prejudice to the defendant." *Barker*, 407 U.S. at 530. Three types of prejudice are relevant: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the possibility that the accused's defense will be impaired because of "dimming memories and loss of exculpatory evidence." *Doggett*, 505 U.S. at 654. Of those, Rodriguez makes only a general reference to "faded memories." *See* ECF No. 121 at 10–11. But he also suggests that the presumptive prejudice associated with a delay over a year is enough to tilt this factor in his favor. *See id.* at 11.

On the latter point, Rodriguez is mistaken. Because the Court has already concluded that the government pursued his arrest "with reasonable diligence," he must "show specific prejudice to his defense." *Doggett*, 505 U.S. at 656. "[G]eneral" references to "the passage of time" will not do—the movant needs an "articulable" connection to specific witnesses' memory, evidence he cannot locate, or specific events he cannot recall. *See Tchibassa*, 452 F.3d at 927 & n.10.

Rodriguez does not approach a showing of specific prejudice. In his motion, he says, in full: "The faded memories due to the delay seriously hinder the Defendant's ability to defend himself against the charges alleged in the indictment particularly when the alleged conspiracy began in in approximately 2014." ECF No. 121 at 10–11. In his reply, he rests solely on presumptive prejudice without mentioning any specifics. *See* ECF No. 130 at 4 ("[N]o showing of prejudice is required . . . ."); *id.* at 7–8. So too in his post-evidentiary-hearing supplementary brief. *See* ECF No. 158 at 7 n.4 (mentioning this factor only to say that "prejudice of the delay is presumed").

At most, Rodriguez has gestured at faded memories and mentioned "the mere passage of

time." *Tchibassa*, 452 F.3d at 927.  In light of the Court's conclusion on the second *Barker* factor, the reason for the delay, that showing falls far short of what is required.  Thus, the fourth factor favors the government.

*     *     *

On balance, the *Barker* factors come out strongly against finding a Sixth Amendment violation.  The most important ingredient in that conclusion is the second factor, the government's reasonable diligence in pursuing Rodriguez.  Also significant is Rodriguez's failure to articulate any specific prejudice arising from the delay.  The length of the delay slightly favors Rodriguez, and Rodriguez's belated assertion of his speedy-trial right slightly favors the government, but those factors played little role in the Court's analysis.  Because the government acted rationally, supported its decisions with substantial evidence, and maintained steady progress towards—and succeeded in—bringing Rodriguez to the United States to face the charges against him, it did not violate his right to a speedy trial.  So the Court will deny his motion to dismiss the indictment on that basis.

### C.    Almonte Has Not Shown Prosecutorial Misconduct

Almonte's pending motion to dismiss, ECF No. 135, seeks to revisit his prior motion to dismiss on constitutional speedy-trial grounds, ECF No. 60.  In opposing his first motion, the government proffered that it did not attempt to extradite Almonte earlier for fear of inducing Finocchiarrio "to destroy evidence, flee prosecution, or otherwise impede the investigation."  ECF No. 61-1 at 9.  Almonte now says that explanation "was likely false," ECF No. 135 at 1, or "fabricated," *id.* at 6.  And he argues that the Court should dismiss the indictment under its supervisory authority to discipline "egregious actions by the government prosecutors," as opposed to pushing

19

for a reassessment of the *Barker* factors in his case.  *Id.* at 5.[4]

The Court can readily dispense with Almonte's motion.  First, it is dubious that dismissal would be an appropriate remedy on prosecutorial-misconduct grounds even if Almonte had shown such misconduct.  In support of his motion, he cites *United States v. Darui*, 614 F. Supp. 2d 25 (D.D.C. 2009).  ECF No. 135 at 5.  In *Darui*, the court mentioned that dismissal could hypothetically be appropriate in extreme circumstances, but it also noted that even perjury by a government witness of which the prosecution was aware had previously been held to justify only a new trial, not dismissal.  *See id.* at 36–38 (citing *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)).  After all, the power to dismiss an indictment under supervisory authority is "frequently discussed but rarely invoked."  *United States v. Samago*, 607 F.2d 877, 881 (9th Cir. 1979).  It requires at least that a "*specific* constitutional right of the defendant has been violated."  *See United States v. Kelly*, 707 F.2d 1460, 1476 (D.C. Cir. 1983).  And if Almonte means to rely on due process, the D.C. Circuit has recently reaffirmed a daunting legal standard for dismissal—"that the government . . . committed coercion, violence, or brutality to the person."  *See United States v. McKeever*, 824 F.3d 1113, 1127–28 (D.C. Cir. 2016) (quotation omitted).  So even on his own terms, to the extent Almonte's request is grounded on alleged prosecutorial misconduct, no caselaw supports it.

Second, and more importantly, Almonte has not shown prosecutorial misconduct, or anything that would cause the Court to reassess the *Barker* factors in his favor.  The crux of his motion is that, in delaying his extradition, the government was not truly motivated by fears about what Finocchiarrio would do.  *See* ECF No. 135 at 4.  But the Court has already found otherwise, based

---

[4] Rodriguez moves to "join and adopt" the arguments in Almonte's motion, along with Almonte's relevant arguments in other filings.  *See* ECF No. 164.  The Court will grant that motion and consider these arguments as having been advanced by both defendants.

on Special Agent Herrera's sworn testimony, written and live, and other contemporaneous evidence of his motivation. Almonte also argues that the government cannot "prove" that he conspired with Finocchiarrio or that Finocchiarrio would have fled the Dominican Republic if Almonte had been arrested first. ECF No. 135 at 4. But the government need not prove all that at this stage. *See id.* It is enough for the government to show that it had a genuine, reasonable belief in those things based on substantial evidence, which it has done.

The evidence now in the record and the Court's factfindings based on it confirm what the government has said all along: that it "prudentially refrained from initiating extradition" until Finocchiarrio was arrested, after which point it "proceeded diligently in seeking [Almonte's] extradition." ECF No. 61-1 at 10. Thus, there is no basis for finding prosecutorial misconduct, much less dismissing the indictment, for that or any other reason.

## IV.   Conclusion and Order

For all the above reasons, it is hereby

**ORDERED** that the government's Sealed Motion for Leave to File under Seal, ECF No. 148, is **DENIED WITHOUT PREJUDICE**. ECF Nos. 148-3 and 148-4 shall remain provisionally under seal until further order of the Court. The Clerk of Court is directed to file on the public docket Government's Exhibits 1–13, ECF Nos. 148-5, 148-6, 148-7, 148-8, 148-9, 148-10, 148-11, 148-12, 148-13, 148-14, 148-15, 148-16, and 148-17. It is further

**ORDERED** that the government may file, by August 15, 2023, a motion renewing its request to file ECF Nos. 148-3 and 148-4 under seal. If the government does not renew its request by that date, the Court will direct the Clerk of Court to file those declarations on the public docket. It is further

**ORDERED** that the parties shall propose, by August 15, 2023—jointly if possible, and individually if necessary—specific redactions to this order that eliminate references to material the

parties wish to remain sealed, enabling a version of this order to be filed on the public docket.  It is further

ORDERED that Defendant Rodriguez's Motion to Join and Adopt Co-Defendant's Motion to Dismiss Indictment for Government Misconduct, ECF No. 164, is **GRANTED**.  It is further

ORDERED that Defendant Rodriguez's Motion to Dismiss Indictment for Prearrest Delay, ECF No. 121, is **DENIED**.  It is further

ORDERED that Defendant Almonte's Motion to Dismiss Indictment for Government Misconduct, ECF No. 135, is **DENIED**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: August 1, 2023